**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA
WHEELING**

**UNITED STATES OF AMERICA,**

**v.**                                                      **Criminal Action No. 5:25-CR-34
(BAILEY)**

**PAUL J. HARRIS,**

        Defendant.

**<u>UNITED STATES' RESPONSE TO DEFENDANT'S OBJECTIONS TO THE
PRESENTENCE REPORT</u>**

Now comes the United States of America, by Matthew L. Harvey, United States Attorney

for the Northern District of West Virginia, by Jarod J. Douglas and Jennifer T. Conklin, Assistant

United States Attorneys for said District, and hereby responds to the defendant's objections to the

presentence report, as ordered by the Court [Doc. 196].

## I.    Objection to Government's Version of the Offense

In the defendant's Objection Number 1, he objects to the government's "factual assertions"

in its version of the offense.  The Court should overrule this objection because the government is

entitled to offer its version of the offense, especially when it is based on its reasonable assessment

of the trial record, as here.

## II.    Objection to Guidelines Loss Calculation

In the defendant's Objections Numbers 2, 3, 4, and 5, he objects to the Guidelines loss

calculation as exceeding $550,000.  The Court should overrule these objections because a

preponderance of the evidence shows that it is a reasonable estimate that the loss exceeded

$550,000.

The government must establish the relevant "amount of loss" by a preponderance of the evidence.  United States v. Miller, 316 F.3d 495, 503 (4th Cir. 2003).  Neither the Guidelines nor the case law require the government to prove the amount of loss with precision; reasonable estimates are anticipated and expressly permitted.  U.S.S.G. § 2B1.1, cmt. n.3(C) ("The court need only make a reasonable estimate of the loss."); United States v. Savage, 885 F.3d 212, 226-28 (4th Cir. 2018).

As an initial matter, the defendant objects to the $352,381.94 in loss for the Carr family.  The defendant argues that this figure does not account for the $300,000 retainer or the refunds the IRS made to the Carr family.  However, the jury's verdict necessarily rejected the defendant's argument that the $300,000 payment in November 2020 was a true retainer.  After all, the jury found the defendant guilty of wire fraud based on the wire of the $300,000 and the use of some of these funds to make a payment on the defendant's wife's credit card.  (See [Doc. 168] at ¶ 10) (explanation of trial record supporting Carr loss figure).  Moreover, the Carr loss figure does account for the refunds the IRS made to the Carr family.  The chart that the government provided to the U.S. Probation Office, and which is now contained in the presentence report at paragraph 62, gives the defendant credit for all payments made to the IRS, regardless of whether they were subsequently refunded.  Therefore, the Court should overrule the defendant's objection insofar as it relates to the Carr loss figure of $352,381.94.

When the Carr loss is combined with Rocky Tingler loss of $34,995, to which the defendant does not object, the total loss is $387,376.94 prior to discussion of the loss suffered by the Covestro plaintiffs.

Next, the defendant objects to the loss attributed to the Covestro plaintiffs because he claims it does not account for purported Medicare payments.  However, the government is unaware of any relevant payments made to Medicare.  For instance, Pamela Stamp testified at trial that the defendant kept $50,000 of her recovery to pay Medicare.  ([Doc. 165] at 12).  She testified that, "for months on end," the defendant's office told her that they were waiting to hear from an attorney the office had purportedly hired in Florida to handle the Medicare lien.  Id.  Meanwhile, she testified that she was not receiving anything from Medicare making a claim on her recovery.  Id. at 13.  She testified she also called Medicare and could not identify any claim it had on her recovery.  Id. at 17.  She testified that she eventually received $48,000 back from the defendant, but he kept $2,000 for Medicare.  Id. at 18.  The government is unaware of records showing that this $2,000 was paid to Medicare for Pamela Stamp, or that the defendant made any payments to Medicare for any of the Covestro plaintiffs.  Accordingly, the defendant's objection should be overruled insofar as it claims that the Covestro plaintiff figure should be reduced for unproven Medicare payments.

Therefore, the figure of $78,748.92, which accounts for the Helms, the Stamps, and the Burketts not being paid all their recovery (even after accounting for the 40% contingency fee and the 10% cap on expenses) remains correct.  (See [Doc. 168] at ¶ 12(a)) (explanation of trial record supporting this figure).  When combined with the Carr and Tingler loss figures, the total loss is $466,125.86 before addressing the fraudulent nature of the Covestro expenses.

Finally, the defendant objects to the loss attributed to the Covestro plaintiffs because he generally disagrees with the treatment of the expenses.

Apparently, the defendant even disagrees with correcting the expense figures for Angelo Georges, M.D., James Cartwright, Gossman Forensics, James Stark, M.D., and Nachman Brautbat, M.D., which are clearly inaccurate, and resulted in an improper gain to him of $51,237.50. (See [Doc. 168] at ¶ 12(b)(i)) (explanation of trial record supporting this figure). The defendant also must disagree with disallowing the $26,400 expense for Investigative Division, but of course this is reasonable given the totality of the evidence about the expense document and given that Franklin Streets was unable to recognize the Covestro case during his trial testimony.

When combined with the figure thus far, that brings the total loss to $543,763.36 before even addressing the Allen Saoud/AGS Medical Consultant expenses, which totaled $220,400. The government previously proposed, and the Court accepted for purposes of calculating a forfeiture money judgment figure of $666,125.86, that 61% or $122,362.50 of the Saoud expenses should be disallowed as fraudulent. (See [Doc. 168] at ¶ 12(b)(iii)) (explanation of trial record supporting this disallowance). For purposes of exceeding $550,000 in loss, however, only about $7,000 or a 3% disallowance is needed, which finds more than enough support in the trial record.

Accordingly, because a preponderance of the evidence supports a reasonable estimate that the loss exceeded $550,000, the Court should overrule the objection and find that the loss exceeded $550,000.

### III.    Objection to 10 or More Victims Enhancement

In the defendant's Objection Number 6, he objects to the application of an enhancement because the offense conduct involved 10 or more victims. The Court should overrule this objection because a preponderance of the evidence shows that at least 10 victims suffered an actual loss.

Section 2B1.1(b)(2)(A)(i) provides for a two-level enhancement when the offense involves 10 or more victims.  As relevant here, the Guidelines define "victim" as "any person who sustained any part of the actual loss . . .."  § 2B1.1, cmt. n.1.

The defendant objects to the inclusion of the Covestro plaintiffs who did not object to his expenses.  However, the Covestro plaintiffs' failure to object to the defendant's expenses does not make the expenses any less fraudulent.  In other words, the plaintiffs accepted the defendant's offer of a 10% cap on expenses on the premise that the expenses totaled at least 10% of the global recovery.  As explained more fully above, in the section on Guidelines loss, this premise was false and fraudulent because the document that the defendant produced to Michelle Giovengo in support of his claim that the expenses totaled 10% of the global recovery contained several misrepresentations.

Accordingly, because the Covestro action involved at least 10 plaintiffs who suffered an actual loss due to the fraudulent expense, the Court should overrule the defendant's objection and apply the 10-or-more-victims enhancement.

## IV.    Objection to Sophisticated Means Enhancement

In the defendant's Objection Number 7, he objects to the application of an enhancement because the offense conduct involved sophisticated means.  The Court should overrule this objection because a preponderance of the evidence shows that the defendant's offense conduct involved sophisticated means.

Section 2B1.1(b)(10)(C) provides for a two-level enhancement when "the offense . . . involved sophisticated means and the defendant engaged in or caused the conduct constituting sophisticated means."  The Guidelines define "sophisticated means" as "especially complex or

5

especially intricate offense conduct pertaining to the execution or concealment of an offense." § 2B1.1, cmt. n.9(B).

To warrant a sophisticated means enhancement, the offense conduct must be more complex than the "minimum conduct required to establish [the covered violation] in its simplest form." United States v. Adepoju, 756 F.3d 250, 257 (4th Cir. 2014).  It is not necessary that each of the defendant's actions involve sophisticated means; rather, the enhancement is warranted where the overall scheme is "sophisticated."  United States v. Savage, 885 F.3d 212, 228 (4th Cir. 2018). Even when "the individual pieces of the scheme may appear to be . . . relatively straightforward and unsophisticated, the scheme's ultimate sophistication [can be] revealed by 'the way all the steps were linked together.'"  United States v. Sanders, 146 F.4th 372, 381-82 (4th Cir. 2025) (quoting United States v. Jinwright, 683 F.3d 471, 486 (4th Cir. 2012)).  In this regard, the length of time of the fraud adds to the sophistication.  Id. at 381 (citing Jinwright, 683 F.3d at 486).

As an initial matter, the length of the fraud reveals a high level of sophistication.  The fraud spanned more than a decade, which required significantly intricate concealment efforts, including:

- lulling communications made in person and by letter, email, and court filings;

- using agents to lull and forestall actions, such as Stacy Nixon and Allen Saoud attempting to persuade Michelle Giovengo that she should be happy with the 10% cap on expenses;

- utilizing the concepts of penalties and interest to justify the large tax checks for the Carrs to account for all the Carr money;

- creating false and fraudulent documents, such as the revocable trust for Fluharty, the copies of the fronts of the tax checks, the Thomas and Jackie Carr tax returns, the itemization of work, and the November 22, 2020 "fee agreement" for the Carrs, the fixed fee "agreement"

6

and itemization of work for Tingler, and the expense document for Michelle Giovengo; and

- pooling personal funds to replace misappropriated client funds, including keying the credit card of the defendant's wife at his law firm, transferring in funds from a personal Charles Schwab account, and having his son-in-law transfer in funds to purchase a cashier's check payable to Optum.

Moreover, the linkage between several of the victims reflects an unusual level of sophistication. Fluharty was linked to the Carrs because the defendant misused Carr money to pay back Fluharty after he had used Fluharty's money, in part, to purchase his own house. The Carrs were linked to the Covestro plaintiffs because the defendant misused the Covestro settlement funds, in part, to pay the Carrs' delinquent income taxes after he had misappropriated the Carr funds, including to pay off his law firm loan.

The defendant's use of a limited liability company to purchase his personal residence with Fluharty's client funds adds to the sophistication. See Savage, 885 F.3d at 228 (listing hiding transactions and the defendant's own name among facts adding to sophistication). Using a limited liability company kept the defendant's name off the publicly filed deed, providing a level of concealment. Using a limited liability company also provided a level of liability protection to potentially shield the property from personal liability.

The defendant's misuse of his position as an attorney adds to the sophistication. He misused his knowledge of the law to further the scheme, such as misadvising Fluharty that he had potential liability for negligent entrustment, intentionally not handling subrogation before settling with Covestro, and intentionally not notifying Optum about the Giovengo recovery until nearly a

year after the settlement.  He also used vexatious litigation or the threat of litigation to intimidate, including the lawsuits against Travis Carr and Burton Hunter, as well as threatening litigation against Scott Summers.

Accordingly, because this conduct, especially taken together, went beyond "the minimum conduct required to establish [fraud] in its simplest form," the Court should overrule the defendant's objection and apply the sophisticated means enhancement.

## V.    Objection to Vulnerable Victim Enhancement

In the defendant's Objection Number 8, he objects to the application of an enhancement because the offense conduct involved a vulnerable victim.  The Court should overrule this objection because a preponderance of the evidence shows that the defendant's offense conduct involved at least one vulnerable victim, Brittany Carr.

Section 3A1.1(b)(1) provides for a two-level enhancement when "the defendant knew or should have known that a victim of the offense was a vulnerable victim."  The Guidelines define "vulnerable victim" to mean "a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct."

To determine whether this enhancement applies, the Court should make a two-step inquiry: "First, a sentencing court must determine that a victim was unusually vulnerable.  Second, the court must assess whether the defendant knew or should have known of such unusual vulnerability." United States v. Etoty, 679 F.3d 292, 294 (4th Cir. 2012) (affirming enhancement where defendant defrauded and stole identity from disabled adult receiving Social Security

benefits).  The government is not required to show that the defendant targeted the victim due to the vulnerability.  United States v. White, 670 F.3d 498, 516 (4th Cir. 2012) (concluding that "district court erred by adopting outdated 'targeting test' . . .").

Here, Brittany Carr was indisputably a victim of the defendant's fraud scheme because much of the Carr money that the defendant misappropriated was intended to pay her delinquent incomes taxes.  In addition, she was undoubtedly unusually vulnerable due to her mental condition.  Her brother, Travis Carr, testified at trial that Brittany, now an adult, continues to have the mind of a four-year-old.  Finally, the defendant knew of Brittany unusual vulnerability because he provided the legal representation that resulted in a financial recovery arising from the injury that caused her condition.

Accordingly, because both steps of the inquiry are satisfied on the trial record, the Court should overrule the objection and apply vulnerable victim enhancement.

## VI.    Objection to Abuse of Position of Trust Enhancement

In the defendant's Objection Number 9, he objects to the application of an enhancement because the offense conduct involved the abuse of a position of trust.  The Court should overrule this objection because the preponderance of the evidence shows that the defendant abused a position of trust, and he used a special skill, in a manner that significantly facilitated the commission and concealment of the offense conduct.

Section 3B1.3 provides for a two-level enhancement "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense . . .."

"For this adjustment to apply [based on a position of public or private trust], the position . . . must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult)."  § 3B1.3, cmt. n.1.  As relevant here, the Guidelines state that this enhancement "applies in the case of an embezzlement of a client's funds by an attorney serving as a guardian . . .."  Id.

For this adjustment to apply based on the use of a special skill, the skill must be one that is "not possessed by members of the general public and usually requiring substantial education, training or licensing."  § 3B1.3, cmt. n.4.  The Guidelines specify that "lawyers" are an example of persons with such skill.  Id.

Here, based on the trial record, the defendant's conduct satisfies both alternative bases for application of this enhancement.

First, the defendant abused a position of private trust as an attorney required to hold client funds in his client trust account.  The trust placed in him by his clients to hold their funds in an account, to which they did not have access or insight, significantly facilitated the defendant's misappropriation of their client funds and the concealment of his misappropriation.

In addition, the defendant used a special skill regarding his knowledge of the law in a manner that significantly facilitated the commission and concealment of the offense.  Specifically, he intentionally misadvised Fluharty regarding his potential liability for negligent entrustment and the defendant's ability to shield the inheritance money from collection on any civil judgment, and he used his knowledge of subrogation as a means of delaying the disbursement of Covestro settlement proceeds.

Contrary to the defendant's assertion, his sometimes-proper handling of client funds and his sometimes-proper use of his special skill as an attorney does prohibit application of this enhancement for the numerous times that he fell woefully and criminally below such standard of care.

Accordingly, because the trial record establishes that the defendant abused a position of trust and used special skill in a manner that significantly facilitated the commission and concealment of his fraud, the Court should overrule the objection and apply the enhancement.

## VII.    Objection to Obstruction of Justice Enhancement

In the defendant's Objection Number 10, he objects to the application of an enhancement because the offense conduct involved obstructing or impeding the administration of justice.  The Court should overrule this objection because the preponderance of the evidence shows that the defendant willfully attempted to impede the administration of justice by perjuring himself and producing a false document or record during his lawyer disciplinary proceeding, when the FBI's investigation was pending.

Section 3C1.1 provides for a two-level enhancement if "(A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (I) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense."

The defendant's objection is based on his argument that the conduct must have been directed at federal investigators or this Court to support application of the enhancement.  However, this is a misunderstanding of what "willful" means here.

For purposes of this enhancement, "'willful' means only that the defendant have engaged in intentional or deliberate acts designed to obstruct any potential investigation, at the time an investigation was in fact pending; it does not mean the defendant had to know for certain that the investigation was pending." United States v. Gilchrist, 658 F.3d 1197, 1206 (9th Cir. 2011) (joining First, Third, Sixth, Seventh, Eighth, and Eleventh circuits); see also United States v. Leach, No. 21-4661, 2023 WL 4181271, *2 (4th Cir. June 26, 2023) (citing Gilchrist approvingly for this proposition); United States v. Muslim, 944 F.3d 154, 169 (4th Cir. 2019) ("[W]here a defendant obstructed justice in state proceedings on a charge, and the federal investigation had not yet begun, but a federal charge was subsequently brought on a related charge, § 3C1.1 may apply."); United States v. Ayers, 416 F.3d 131, 134 (2d Cir. 2005) ("[t]he 'willfulness' required by § 3C1.1 pertains to obstruction of 'the administration of justice,' not a particular investigation.").

Here, as the trial record shows, the FBI's investigation was opened in 2022 and remained pending in February 2024, when the defendant perjured himself and produced a false document or record during his lawyer disciplinary proceeding.  § 3C1.1 cmt. n.4(B) & (C).

The perjured testimony included testimony that he used the remainder of the Nationwide check to pay the Carrs' outstanding tax liabilities, that he sent in the Carr tax checks around when they were dated in 2022, and that he did not send in the Carr tax checks in 2023.  See Government's Trial Exhibit No. 269.

The false document or record included the itemization of work (Defendant's Trial Exhibit No. 9) and the November 22, 2020 "retainer" agreement (Government Trial Exhibit No. 1) for the Carrs and the fixed fee "agreement" and itemization of work (Government Trial Exhibit No. 134)

12

for Tingler.

Accordingly, even in the absence of evidence that the defendant knew for certain that the FBI's investigation was pending in February 2024, let alone evidence that the defendant directed his conduct toward federal investigators or this Court, the Court should overrule the objection and apply the enhancement because the trial records shows that the defendant engaged in intentional or deliberate acts designed to obstruct any potential investigation, at the time an investigation was in fact pending, when he perjured himself and produced a false document or record during his lawyer disciplinary proceeding.[1]

WHEREFORE, the United States respectfully requests that the Court overrule the defendant's objections to the presentence report.

Respectfully submitted,

MATTHEW L. HARVEY
UNITED STATES ATTORNEY

By:    /s/ Jarod J. Douglas
Jarod J. Douglas
Assistant United States Attorney

And

/s/ Jennifer T. Conklin
Jennifer T. Conklin
Assistant United States Attorney

---

[1] Upon information and belief, the defendant has refused to provide financial information to the U.S. Probation Officer, which the government notes the Fourth Circuit has previously held is an independent basis for application of the obstruction enhancement. See United States v. Williams, 152 F.3d 294, 302-04 (4th Cir. 1998); United States v. Ashers, 968 F.2d 411, 412-13 (4th Cir. 1992).

**CERTIFICATE OF SERVICE**

I, Jarod J. Douglas, Assistant United States Attorney for the Northern District of West Virginia, hereby certify that on March 17, 2026, the foregoing UNITED STATES' RESPONSE TO DEFENDANT'S OBJECTIONS TO THE PRESENTENCE REPORT was filed with the Clerk of the Court via the CM/ECF system, which was further served on the defendant via email to harrislawofficeswhg@gmail.com.

By: /s/ Jarod J. Douglas
    Jarod J. Douglas
    Assistant United States Attorney